[No. A032552. First Dist., Div. Two. May 13, 1987.]

CALIFORNIA STATE AUTOMOBILE ASSOCIATION, Plaintiff and Respondent, v.
FRANCHISE TAX BOARD, Defendant and Appellant.

**COUNSEL**

John K. Van de Kamp, Attorney General, Timothy G. Laddish, Deputy Attorney General, and Calvin J. Abe for Defendant and Appellant.

Valentine Brookes, Lawrence V. Brookes and Brookes & Brookes for Plaintiff and Respondentt..

**OPINION**

**SMITH, J.**—In this case of first impression, we grapple with the meaning of the phrase "co-operative or a mutual basis" as it appears in section 24405 of the Revenue and Taxation Code.

In 1973 defendant and appellant Franchise Tax Board (hereinafter, the Board) issued proposed additional assessments of taxes due from plaintiff-respondent California State Automobile Association (hereinafter CSAA)

based upon the Board's determination that for the years 1968 through 1971, CSAA improperly took a deduction pursuant to Revenue and Taxation section 24405[1] for income on business activities conducted with its members and income from nonmember business conducted on a nonprofit basis. The basis for the Board's determination was that CSAA was not eligible for the deduction because it was not "organized and operated in whole or in part on a co-operative or a mutual basis," within the meaning of section 24405.

After the Board issued a ruling upholding the additional assessment, CSAA paid the disputed taxes and filed a complaint for a refund in superior court. The superior court granted CSAA's motion for summary judgment, finding that CSAA did indeed fall within the purview of section 24405. The Board appeals.

### BACKGROUND

The facts are not in dispute. CSAA was incorporated in 1907 under the nonprofit corporation laws of the State of California. The articles of incorporation provide that "said corporation is not organized for pecuniary profit and shall have no capital stock, nor shall any shares of stock be issued, but each member thereof shall have one vote only on all matters requiring the action or sanction of the membership." Among the stated purposes of the corporation as set forth in the articles are the promotion of the betterment and maintenance of roads and highways in the state, the advocacy of adoption of "just, rational and intelligent legislation in reference to roads, highways and waterways . . .," the furnishing of advice and assistance to travelers and tourists in this state and elsewhere, the protection of the interests of its members in connection with the stated purposes and the affiliation with similar organizations in other states.

To be a member, one must pay a one-time enrollment fee, plus annual membership dues. In return, CSAA provides its members with a variety of services including emergency road and home garage service, free maps, travel information and hotel and motel reservations, a subscription to Motorland magazine, (a periodical published by CSAA which contains travel articles and updated travel information), and assistance with automobile financing, traffic citations and vehicle registration. CSAA also operates a travel agency and provides automobile and homeowners insurance through its interinsurance bureau.[2] Because of the requirements of law, the latter two services are

---

[1] All future statutory references are to the Revenue and Taxation Code, unless otherwise specified.

[2] The interinsurance bureau is operated as an independent, separately identifiable unit of CSAA. Its income is subject to California's gross premiums tax on insurance companies (see Cal. Const. art. XIII § 28; 5 Witkin, Summary of Cal. Law (8th ed.) Taxation § 269, p. 4224) and is therefore not involved in the subject controversy.

available to nonmembers under some circumstances, although patronage from nonmembers is not solicited.

Since its inception, CSAA has characterized itself as a cooperative enterprise. In accordance with its bylaws, CSAA's board of directors sets the annual membership dues. The dues are set pursuant to a policy to keep them as low as financially possible while enabling the organization to avoid a substantial deficit which would result from unexpectedly heavy usage of member services. As a result of this policy, annual membership fees did not increase at all during the years 1953 to 1968, and increased by only $3 in 1968. During the years in question membership dues totalled 86 percent of CSAA's total income. Total membership in CSAA has grown from only a handful in 1907 to more than 1 million by 1971.

In 1950 the legal staff of the Board ruled that CSAA was operated on a cooperative or mutual basis and therefore entitled to the exemption from taxation on income with its members under section 24121n, the predecessor to section 24405. In 1972, however, a Board auditor determined that CSAA was not a "mutual or cooperative association" and proposed disallowance of the deduction taken for business revenue done with CSAA members for the taxable years 1968, 1969, 1970 and 1971. The proposed additional assessments were upheld over CSAA's protest by the state Board of Equalization, which issued an opinion agreeing with the auditor.

On September 2, 1980, CSAA filed a complaint for refund of the additional taxes paid as the result of the Board's ruling. The Board filed an answer, admitting the essential facts set forth in the complaint, but denying that these facts entitled CSAA to the deduction. CSAA moved for summary judgment based upon a stipulation of facts and the uncontroverted affidavit of one of its officers.

The trial court initially treated the motion as one for summary adjudication and granted it to the extent of determining that, for the years in question, CSAA was "an association organized and operated in whole or in part on a cooperative or mutual basis within the meaning of section 24405 . . ." but reserving judgment on the monetary issues. Eventually, both sides agreed on the amount of the refund assuming the court's partial adjudication was correct and judgment was ultimately entered in favor of CSAA for $579,828.21, plus interest as provided by law.

APPEAL

Section 24401 provides that ". . . there shall be allowed as deductions in computing taxable income the items specified in this article." Section 24405,

which we are called upon to construe here, allows "associations *organized and operated in whole or in part on a co-operative or a mutual basis*" to deduct "all income resulting from or arising out of business activities for or with their members carried on by them or their agents; or when done on a nonprofit basis for or with nonmembers . . . ." (Italics added.)[3]

Section 24405 traces its roots back to 1929 when it was enacted in substantially the same language as section 8, subdivision (1) of the Bank and Corporation Franchise Tax Act. (Stats. 1929, ch. 13, p. 24.) Unfortunately, there has never been a statutory definition of "co-operative" or "mutual," nor are there any California cases addressing the meaning of these terms. While no case or statute defines the word "cooperative" we observe that, in the interpretation to tax measures, the common and ordinary meaning of words, is significant. (Sutherland, Statutory Construction (4th ed.) § 66.03, p. 302.) Webster's Third New International Dictionary (1970) defines "cooperative" as "an enterprise or organization owned by and operated for the benefit of those using its services." CSAA undisputedly comes within that definition.

Citing a number of federal tax decisions, the Board claims that mutual insurance companies and cooperative organizations must have at least four characteristics: "(1) common equitable ownership of the assets by the members; (2) the right of dues paying members to be members to the exclusion of others and to choose the management; (3) a sole business purpose of supplying goods, services or insurance at cost; and (4) *the right of the members to a return of the premiums paid in excess of the amounts necessary to cover losses and expenses.*" (Italics added.) ▆ The Board concedes that CSAA meets the first three of these criteria, but fails to meet the fourth because, as a nonprofit corporation, CSAA is prohibited by law from distributing any profits or dividends to members except upon dissolution.[4] The

---

[3] The full text of section 24405 reads as follows: "In the case of other associations organized and operated in whole or in part on a co-operative or a mutual basis, all income resulting from or arising out of business activities for or with their members carried on by them or their agents; or when done on a nonprofit basis for or with nonmembers; provided, however, that the deduction allowable under this section shall not apply to such co-operative or mutual associations whose income is principally derived from the sale in the regular course of business of tangible personal property other than water, agricultural products, or food sold at wholesale.

"For the purposes of this section 'food sold at wholesale' means a sale of food to anyone engaged in the business of selling food who holds a seller's permit issued pursuant to Section 6066, and who at the time of purchasing the food either:

"(1) Intends to sell it in the regular course of business; or

"(2) Is unable to ascertain at the time of purchase whether the food will be sold or used for some other purpose."

[4] During the time period applicable herein, former Corporations Code section 9200 provided, in pertinent part: "[N]o corporation formed or existing under this part [General Nonprofit Corporation Law] shall distribute any gains, profits, or dividends to any of its members as such except upon dissolution or winding up." (Stats. 1947, ch. 1038, § 9200, p. 2410, as amended by Stats. 1949, ch. 1391, § 1, p. 2427. The quoted language was added by the 1949 amend.)

Board then argues that CSAA's inability to meet this fourth criterion is its own fault because it did not become a "cooperative corporation" under the Cooperative Corporations statutes first enacted in 1939 (Stats. 1939, ch. 808, § 1, p. 2359, now Corp. Code, § 12200 et seq.), but instead chose to remain a nonprofit corporation.

There are several flaws in the Board's reasoning. First, the federal cases which the Board cites appearing to hold that the right of members to a return of premiums in excess of the amounts needed to cover loss and expenses is an essential characteristic of "mutuals," are based on the Revenue Act of 1942 which classified *insurance* companies into three distinct groups, roughly life, insurance companies other than life, and mutual. (*Modern Life & Accident Insurance Company* v. *C.I.R.* (1968) 49 T.C. 670, affd. (7th Cir. 1969) 420 F.2d 36; *Thompson* v. *White River Burial Ass'n.* (8th Cir. 1950) 178 F.2d 954; *The Mutual Fire, Marine and Inland Ins. Co.* (1947) 8 T.C. 1212; *Holyoke Mutual Fire Ins. Co.* (1957) 28 T.C. 112.) The classification group into which the taxpayer fell determined its entire measure of taxation. On the other hand, section 24405 merely allows a special *deduction* for certain associations and is much broader in scope, covering virtually *all* associations operated wholly or even partly on a cooperative or mutual basis. The federal insurance statutes are therefore different in purpose and effect than the state statute considered here. Since there is no basis whatsoever for concluding that the Legislature intended to "pattern" or copy the deduction allowed under section 24405 after federal income tax statutes dealing with taxation of insurance companies, there is no reason to view the federal cases interpreting the latter laws as controlling. (Cf. *Trimont Land Co.* v. *Truckee Sanitary Dist.* (1983) 145 Cal.App.3d 330, 354 [193 Cal.Rptr. 568]; *Union Oil Associates* v. *Johnson* (1935) 2 Cal.2d 727, 735 [43 P.2d 291, 98 A.L.R. 1499.)

Even the federal cases relied upon by the Board recognize that the essence of a mutual organization is that the association be run for the benefit of the members rather than the association. (e.g., *Mutual Fire, supra,* 8 T.C. at p. 1218; *Keystone Mut. Casualty Co.* v. *Driscoll* (1942) 44 F.Supp. 658, affd. (3d Cir. 1943) 137 F.2d 907.) In order to remain truly "mutual" insurance companies therefore have to be able to employ means of distributing excess capital back to its members, as for example, through issuance of rebates of premiums or cash dividends. However, the presence or absence of one single quality or characteristic should not be viewed as a "litmus test" for determining whether an organization operates mutually or cooperatively. (See *Keystone Automobile C. Cas. Co.* v. *Commissioner of Int. Rev.* (3d Cir. 1941) 122 F.2d. 886, 890, cert. den. (1942) 315 U.S. 814 [86 L.Ed. 1213, 62 S.Ct. 799].) CSAA is not an insurance company, but a service organization supplying services to its members. As the trial court noted, the fact that

CSAA uses surplus capital to keep membership dues as low as possible while providing the maximum services to its members should be recognized as a legitimate means of retaining its cooperative or mutual method of operation.[5]

We also note that the language employed by the Legislature in section 24405 is much broader in terms of eligibility under the statute than the classifications imposed by federal insurance taxation laws. The deduction is granted to associations operated "in whole *or in part* on a co-operative or a mutual basis." (Italics added.) Thus, even assuming that a "right-to-distribution" feature can be imposed as one of the essential characteristics of a mutual association, CSAA would still be eligible because its possession of three of the four characteristics of mutual or cooperative associations qualifies it as operated at least "in part" on such a basis.

The only federal case cited to us which directly addresses the meaning of the term "cooperative" is *Peninsula Light Co., Inc.* v. *United States* (9th Cir. 1977) 552 F.2d 878, in which the government attempted to revoke the tax-exempt status of an electrical power cooperative which was operated in such a way that in its nearly 40-year history it had never made patronage refunds, credits or distributions, but rather all surplus over the cost of power was "plowed back into the operation . . . or kept in the reserve fund." (*Id.,* at p. 879.) The case bears striking similarity to the one at bar, in that there too the taxpayer had been granted the tax benefits of a cooperative by the taxing authority, which, years later, attempted to revoke its decision based not on any change in the taxpayer's method of operation or the governing statutes, but on a suddenly perceived failure to operate as a "true cooperative" because of the lack of patronage distributions to its members. The Ninth Circuit Court of Appeals squarely rejected the government's

---

[5]In his treatise on the law of cooperatives, Professor Israel Packel describes them as generally possessing the following features:

"*control and ownership of each member is substantially equal;

"*members are limited to those who will avail themselves of the services furnished by the association;

"*transfer of ownership interests is prohibited or limited;

"*capital investment receives either no return or a limited return*;

"*economic benefits pass to the members on a substantially equal basis or on the basis of their patronage of the association;

"*members are not personally liable for obligations of the association in the absence of a direct undertaking or authorization by them;

"*death, bankruptcy or withdrawal of one or more members does not terminate the association; and

"*services of the association are furnished primarily for the use of the members." (Packel, Organization and Operation of Cooperatives (4th ed. 1970) American Law Institute (1970) pp. 4-5, italics added.)

The right to receive dividends or distributions, which the Board contends is a sine qua non of a cooperative, is not present among these characteristics.

contention, stating in part: "In our view, tax-exempt status should be conferred upon mutual organizations which exist and operate without a profit motive." (*Id.*, at pp. 880-881.) "All of the members have an equal interest and equal voice. The corporation does not exist or operate with improper profit motives or results. For these reasons . . . we hold . . . that Peninsula Light Company, Inc. is a mutual organization entitled to tax-exempt status under 26 U.S.C. § 501(c)(12). We further hold that Peninsula need not credit or make distributions on a patronage basis in order to preserve its tax-exempt status." (*Id.*, at p. 882.) The reasoning of the court in *Peninsula Light* applies here, but with greater force, since we are concerned with not a total *exemption* from taxation, but simply a deduction for net income from business with its own members. As Justice Friedman wrote for the Third District in *Woodland Production Credit Assn.* v. *Franchise Tax Board* (1964) 225 Cal.App.2d 293 , because "[t]ransactions between the cooperative and its patrons, or which it conducts as their agent, constitute its business activity, the very object of its existence . . . *section 24405 . . . deductibility does not depend on distribution of the income in the form of patronage dividends.*" (*Id.*, at p. 299, italics added.)

In the face of the above authorities, the Board concedes, as it must, that CSAA need not ever issue refunds, rebates or dividends in order to keep its tax deduction under section 24405. Still, the Board argues, CSAA must have the *right* to issue dividends to its members, which it lacks because of the prohibition set forth in Corporations Code section 9200. (See fn., 4 *ante.*) This argument ignores the underlying theory behind the excludibility of income under section 24405, which is that such earnings are not "profits" but rather savings produced for patrons through a pooled effort. (*Anaheim Union Water Co.* v. *Franchise Tax Bd.* (1972) 26 Cal.App.3d 95, 105 [102 Cal.Rptr. 692]; *Woodland Production Credit Assn., supra,* 225 Cal.App.2d at p. 298.) It is the *savings* that are nontaxable because, even though they are not distributed, they belong to the members, whose individual interests are too remote and contingent to be recognized for tax purposes. (*Id.*, at p. 299.) The Board makes no claim that CSAA's assets are not equitably owned by its members, who would be entitled the net distribution thereof if it were ever to be dissolved. Nor does it assert that CSAA accumulated surplus capital in a manner inconsistent with a nonprofit motive during the years in question. To disqualify CSAA from eligibility under section 24405 simply because it is structured in such a way that surplus earnings are "plowed back into the operation" instead of being distributed to individual members, would we think, read into the statute a slavish adherence to uniformity not consistent with its language or purpose.

The Board's contention that CSAA lost it eligibility for income deductions under section 24405 by not becoming a "cooperative corporation" when the

cooperative corporation statutes were enacted in 1939, demonstrates the illogic of its position.

As the parties agree, CSAA *could not* have reincorporated under cooperative corporations statutes since those statutes are limited, by definition, to corporations consisting of "ultimate producers or consumers, or both," none of which characterize CSAA's members. (Corp. Code, § 12201.) The Board's contention therefore requires us to assume that, in enacting the cooperative corporations statutes, the Legislature, without expressly saying so, intended to *repeal* the special tax deduction for organizations which were operated mutually or cooperatively but could not become a "cooperative corporation" under the new law. ▮ It is fundamental that amendments or repeals by implication are disfavored and are to be recognized only where there is an irreconcilable conflict between statutes. (*Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449]; *In re White* (1969) 1 Cal.3d 207, 212 [81 Cal.Rptr. 780, 460 P.2d 980]; *People* v. *Clark* (1966) 241 Cal.App.2d 775, 779 [51 Cal.Rptr. 7].) ▮ Moreover, it should not be presumed that the Legislature, in the enactment of statutes, intends to overthrow long established principles of law unless such intention is made clear by declaration or necessary implication. (*Fuentes, supra; Theodor* v. *Superior Court* (1972) 8 Cal.3d. 77, 92 [104 Cal.Rptr. 226, 501 P.2d 234].) In the absence of a clear expression to such effect, we will not presume that the Legislature intended to repeal the deduction previously enjoyed by CSAA and like organizations solely by implication. (See *Metropolitan Water District* v. *Dorff* (1979) 98 Cal.App.3d 109, 114 [159 Cal.Rptr. 211].)

The Board's argument would also require us to believe that the Legislature intended to supplant the language in section 24405 describing associations operated "in whole or part on a co-operative or a mutual or cooperative basis" with the language describing only cooperative corporations formed pursuant to Corporations Code section 12200 et seq. In fact, the history of the statutes suggest otherwise.

After the cooperative corporations statutes were made part of the Corporations Code in 1947, the Legislature retained tax deductions for a host of cooperative or mutually operated enterprises by adding section 24403 (dealing with mutual building and loan associations), section 24404 (dealing with farmer's and fruit growers cooperatives) and section 24405 (dealing with "other associations" organized and operated mutually or cooperatively) to the Revenue and Taxation Code. (Stats. 1955, ch. 938, § 20, p. 1587.) In 1961, the Legislature added section 24406, which provides for a special deduction for "other associations *organized and operated as co-operative corporations* pursuant to Part 2 (commencing with Section 12200), Division 3, Title 1 of the Corporations Code, whose income is principally derived

from the sale . . . of tangible personal property other than water, agricultural products or food sold at wholesale. . . ." (Stats. 1961, ch. 1934, § 1, p. 4004, italics added.)[6]

By leaving the basic broad language of section 24405 untouched, while making special reference to cooperative corporations in a subsequently enacted section, the Legislature dispelled any notion that "wholly or partly mutual or cooperative" and "cooperative corporation" were to be read synonymously, or that the latter term was meant to be substituted in for the former. This is particularly true here, since the deduction for mutual or cooperative associations had been an integral part of the tax law and relied upon by such groups long before the cooperative corporations statutes came into existence. (See *Cal. Drive-In Restaurant Assn.* v. *Clark* (1943) 22 Cal.2d 287, 292 [140 P.2d 657, 147 A.L.R. 1028].)

■ We hold that, for the tax years in question, the trial court correctly determined that CSAA was organized and operated in whole or in part on a cooperative or mutual basis. We reject the Board's position that the right to receive patronage dividends, credits or rebates is essential to qualify under section 24405, especially for a service organization such as CSAA, where such distributions may be impracticable and/or unnecessary to retain its characteristic as a cooperative or mutual enterprise.

DISPOSITION

The judgment of the superior court is affirmed.

Rouse, Acting P. J., and Benson, J. concurred.

Appellant's petition for review by the Supreme Court was denied July 29, 1987.

---

[6]In 1960, section 24405 was amended so as to exclude mutual organizations whose principal income was derived from the sale of products other than water, food or agricultural products. Section 24406 therefore was apparently designed to recapture the deduction for the newly excluded group of cooperatives provided that they organized themselves as "cooperative corporations."